UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:

FELT MANUFACTURING, CO., INC.
f/k/a FOSS MANUFACTURING CO., INC.,
                              Debtor.

Bk. No. 05-13724-JMD
Chapter 11

LAWRENCE E. RIFKIN, PLAN
ADMINISTRATOR AND TRUSTEE OF THE
FELT MANUFACTURING CO., INC.
LIQUIDATION TRUST
                              Plaintiff,

        v.

ENTEC POLYMERS, LLC et al.

                              Defendant.

Adv. No. 07-1170-JMD

Trial Date: November 20, 2008
Time: 9:00 a.m.

## PLAINTIFF'S POST-TRIAL BRIEF

Dated:    December 12, 2008

PACHULSKI STANG ZIEHL & JONES LLP

James K.T. Hunter (admitted pro hac vice)
Jason S. Pomerantz (admitted pro hac vice)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067
Lead Counsel for Plan Administrator

Joseph A. Foster (#01572)
Cheryl C. Deshaies (#05451)
MCLANE, GRAF, RAULERSON &
        MIDDLETON, PA
900 Elm Street, P.O. Box 326
Manchester, NH  03105-0326
Local Counsel for Plan Administrator

1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................... 1

II.   DISCUSSION ......................................................................................................... 2

   A.   The Ordinary Course Defense Issues ................................................................ 2

      1.    A Payment Is Not Deemed To Have Been Made In The "Ordinary Course" If It Is Made Either Earlier Or Later Than The "Ordinary Course" Payment Period. ....... 2

      2.    Plaintiff's Expert, Michael Atkinson, Established That All But A Portion Of One Of The Transfers Failed The Subjective Test. ..................................................... 4

      3.    The Only Competent Testimony As To "Ordinary Business Terms" Within The Meaning Of 11 U.S.C. §547(c)(2) Was Offered By Atkinson, Who Testified That Any Payments Outside Of 33 To 64 Days Past Invoice Date Were Outside Of "Ordinary Business Terms". ............................................................................... 6

      4.    Even If The Transfers Had Been Made Within The Periods Established By The Subjective And Objective Prongs, All Of The Transfers Would Still Fail The Subjective Prong Because The Transfers Were, According To Defendant's Witnesses' Undisputed Testimony At Trial, Made As The Result Of Intense Collection Efforts Which Substantially Differed From Those Defendant Had Utilized During The Pre-Preference Period. ....................................................... 9

   B.   The New Value Defense Issue ......................................................................... 12

   C.   Plaintiff Should Be Awarded Prejudgment Interest. ...................................... 20

III.  CONCLUSION ...................................................................................................... 21

# TABLE OF AUTHORITIES

**Page**

## Cases

Anderson v. Ganis Credit Corp. (In re Weilert R.V., Inc.),
 245 B.R. 377, 386 (Bankr.C.D.Cal.2000) ...................................................................8

Hovis v. Powers Construction Co. (In re Hoffman Associates, Inc.),
 194 B.R. 943, 955 (Bankr.D.S.C. 1995) ....................................................................8

In re American Intern. Airways, Inc.,
 56 B.R. 551, 555 (Bkrtcy. E.D.Pa. 1986)................................................................14

In re Ideal Security Hardware,
 186 B.R. at 239 .......................................................................................................7, 8

In re Contempri Homes, Inc.,
 269 B.R. 124, 127, 129-130 (Bkrtcy.M.D.Pa.2001)..................................................8

In re Fred Hawes Organization, Inc.,
 957 F.2d at 243 n. 5...................................................................................................3

In re Globe Building Materials, Inc.,
 334, B.R. 416, 426 (Bkrtcy. N.D. Ind. 2005) ....................................... 13, 14, 15, 20

In re H.P. King Co., Inc.,
 64 B.R. 487, 491 (Bkrtcy. E.D.N.C. 1986) ............................................................22

In re Homes of Port Charlotte, Florida, Inc.,
 109 B.R. 489, 491 (Bkrtcy. M.D. Fla. 1990)...........................................................3

In re Intercontinental Polymers, Inc.,
 359 B.R. 868, 8881 (Bkrtcy. E.D. Tenn. 2005)......................................................13

In re Molded Acoustical Products, Inc.,
 18 F.3d 217, 228 (3d Cir. 1994) ...........................................................................4, 6

In re Pearson Industries, Inc.,
 142, B.R. 831, 844-5 (Bkrtcy.C.D.Ill.1992).............................................................8

In re Spada,
 903 F.2d 971, 976 (3d Cir. 1990). ..........................................................................14

In re Spirit Holding,
 214 B.R. at 901-02....................................................................................................8

In re Tennessee Chemical Co.,
   159 B.R. 501, 512 (Bkrtcy.E.D. Tenn. 1993).............................................................4

In re Toy King Distributors, Inc.,
   256 B.R. 1, 126 (Bkrtcy.M.D. Fla. 2000) ...............................................................7

In re Xonics Imaging, Inc.,
   837 F.2d at 765 ..........................................................................................................3

Matter of Dayton Circuit Courts No. 2,
   80 B.R. 434 (S.D. Ohio 1987) ................................................................................20

Matter of Tolona Pizza Products, Corp.
   2 F.3d 1029, 1033 (7th Cir. 1993) ...........................................................................2

Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.),
   220 B.R. 1005, 1020-1 (B.A.P. 10th Cir.1998)........................................................9

Rushton v. E & S Int'l Enters., Inc, (In re Eleva, Inc.),
   235 B.R. 486, 489 (10th Cir. BAP 1999).................................................................13

## Statutes

11 U.S.C. §547 ...........................................................................2, 3, 4, 6, 8, 9, 13, 20

28 U.S.C. §1962 ....................................................................................................20

## Other Authorities

5 Collier on Bankruptcy (15 Ed.Rev.) ¶547.04[2][9] at pp. 547-60 through 547-61 ...............9, 11

# I.
# INTRODUCTION

Plaintiff Lawrence E. Rifken, as Plan Administrator and Trustee of the Felt

Manufacturing Co., Inc. Liquidation Trust, ("Plaintiff") filed the instant adversary proceeding

against Defendant Entec Polymers, LLC ("Defendant") on September 14, 2007.  In his

Complaint, Plaintiff claims that Defendant is liable as successor-in-interest to Goldmark

Distribution ("Goldmark") as a result of Goldmark's receipt of six transfers totaling $753,700.45

(the "Transfers") from Foss Manufacturing Co., Inc., ("Debtor") within ninety days of the

commencement of Debtor's chapter 11 case on September 16, 2005.

Most of the facts and law pertaining to Plaintiff's claims and Defendant's defenses are

undisputed.  As is established in the Stipulations of Uncontested Facts section of the Amended

Final Pretrial Statement filed herein on November 14, 2008, all of the essential elements of a

prima facie case for preferential transfers under 11 U.S.C. §547 are admitted (Stipulated Facts 8-

13).  In addition, Plaintiff has stipulated that Goldmark provided "new value" within the meaning

of 11 U.S.C. §547 (c)(4) in the amount of $234,353.90 (Stipulated Facts 28-29), leaving a net

amount of $519,346.55 ($753,700.45 - $234,353.90) which Plaintiff seeks to recover from

Defendant by reason of the Transfers.

Thus, the remaining factual and legal issues which remained to be decided at trial were

few and clearly defined.  Plaintiff addresses each in turn below.

# II.
# DISCUSSION

## A.    The Ordinary Course Defense Issues

### 1.    A Payment Is Not Deemed To Have Been Made In The "Ordinary Course" If It Is Made Either Earlier Or Later Than The "Ordinary Course" Payment Period.

At the conclusion of the trial, the Court stated that the parties' post-trial briefs should address, inter alia, the issue of whether the "ordinary course" defense is inapplicable only where payments during the preference period are made earlier than the ordinary course, or whether that defense is also inapplicable when payments during the preference period are made later than the ordinary course.  The Seventh Circuit Court of Appeals addressed this specific issue in Matter of Tolona Pizza Products Corp., 3 F.3d 1029, 1033 (7th Cir. 1993) as follows:

> It may seem odd that paying a debt late would ever be regarded as a preference to the creditor thus paid belatedly.  But it is all relative.  A debtor who has entered the preference period—who is therefore only 90 days, or fewer, away from plunging into bankruptcy—is typically unable to pay all his outstanding debts in full as they come due.  If he pays one and not the others, as happened here, the payment though late is still a preference to that creditor, and is avoidable unless the conditions of section 547(c)(2) are met.  One condition is that payment be in the ordinary course of both the debtor's and the creditor's business.  A late payment normally will not be.  It will therefore be an avoidable preference.

> This is not a dryly syllogistic conclusion.  The purpose of the preference status is to prevent the debtor during his slide toward bankruptcy from trying to stave off the evil day by giving preferential treatment to his most importunate creditors, who may sometimes be those who have been waiting longest to be paid.  Unless the favoring of particular creditors is outlawed, the masse of creditors of a shaky firm will be nervous, fearing that one or a few of their number are going to walk away with all the firm's assets; and this fear may precipitate debtors into bankruptcy earlier than is socially desirable.  *In re Xonics Imaging, Inc., supra,* 837 F.2d at 765; *In re Fred Hawes Organization, Inc., supra,* 957 F.2d at 243 n. 5.  (Id., 3 F.3d at 1032.)

In In re Homes of Port Charlotte, Florida, Inc., 109 B.R. 489, 491 (Bkrtcy. M.D. Fla. 1990), the bankruptcy court held, in circumstances virtually on all four with those here

presented, that preference liability was established despite the assertion of an ordinary course

defense as follows:

> The Defendant stated that payment terms were due on the 11th of
> the month and past due on the 25th of the month.  Although the
> Debtor generally paid its invoices within 28-76 days from the date
> of the invoice prior to the preference period, the payment interval
> increased from 63 days to 109 days during the preference period.
> Even though the payments prior to the preference period were
> generally later than the invoice terms, clearly, the dealings between
> the parties changed during the preference period.

> Based on the foregoing, this Court is satisfied that the dealings
> between the parties during the preference period were not in the
> ordinary course of business and that, therefore, any payment made
> beyond 76 days from the date of the invoice is a preference and
> outside the protection of § 547(c)(2)of the Bankruptcy Code.  (Id.,
> 109 B.R. at 491.)

See also In re Molded Acoustical Products, Inc., 18 F.3d 217, 228 (3d Cir. 1994) ["But what is

clearly the dispositive factor in this case, and what allows us to conclude as a matter of law that

the payments at issue here were not 'made according to ordinary business terms,' is the evidence

that the terms dominating throughout the pre-insolvency relationship between the parties (58

days) were far shorter than the preference-(insolvency-) period payment terms (89 days)."]; In re

Tennessee Chemical Co., 159 B.R. 501, 512 (Bkrtcy.E.D. Tenn. 1993) [where pre-preference

period payments usually, but not always, less than ten days late, "payment sixteen days late was

too late to be in the ordinary course of business"].

In sum, the law is settled that a payment is not made in the "ordinary course" if it is made

either earlier or later than (1) the ordinary course of dealing between the parties themselves

during the pre-preference period (the "Subjective Prong") or (2) the period provided for

according to ordinary business terms (the "Objective Prong").  Given Defendant's concession at

the commencement of trial that this adversary proceeding is subject to the pre-BAPCPA version of 11 U.S.C. §547(c)(2), this means that the ordinary course defense is unavailable with respect to each and all of the Transfers that were made later than the period allowed under either the Subjective Prong (i.e., 11 U.S.C. § 547(c)(2)(B)) or the Objective Prong (i.e., 11 U.S.C. § 547(c)(2)(C)) of 11 U.S.C. §547(c)(2).

    2.    **Plaintiff's Expert, Michael Atkinson, Established That All But A Portion Of One Of The Transfers Failed The Subjective Test.**

Plaintiff's expert, Michael Atkinson ("Atkinson"), testified at trial regarding his analysis comparing Debtor's payments to Goldmark during (1) the preference period and (2) approximately one year prior to the preference period. That analysis, summarized at pages 6-7 of Plaintiff's Trial Exhibit "16", established that there was an increase in the number of days invoices were outstanding before payment during the preference period as compared with the pre-preference period (i.e., payments were delayed in the preference period). More particularly, during the pre-preference period, approximately 75% of invoices were paid between 67 and 80 days outstanding. By contrast, during the preference period, only approximately 9% of invoices were paid between 67 and 80 days. Approximately 91% of the preference period invoices were outstanding 85 days or more before they were paid, compared to only 25% of invoices in the pre-preference period. Furthermore, 73% of preference period invoices were paid well beyond the parties' ordinary range, between 91 and 141 days outstanding, in comparison to 5% of pre-preference period invoices paid within this range (one invoice paid at 97 days outstanding).

Based on this data, Atkinson testified that, in his opinion, the ordinary course of business relationship was for payment to be made to Goldmark from Foss between 67 and 80 days after

invoice date.  Atkinson's opinion as to the subjective test was not contested by any expert or non-expert witness called by Defendant, though Defendant may argue that its cross-examination of Atkinson demonstrated that the "subjective" ordinary course period should be stretched from 67 to 80 days to 67 to 85 days--thereby allowing one additional Transfer in the amount of $117,363.75 (see Stipulated Fact 17(a)) to meet the subjective test.

In sum, if Atkinson's opinion as to the "subjective" ordinary course period of 67 to 80 days is accepted, then only one portion of the final Transfer, in the amount of $92,825.00 (see Stipulated Fact 17, (f), (III)) was within that period.  If the period is stretched, Plaintiff believes arbitrarily, to 67 to 85 days, then the first Transfer in the amount of $117,363.85 also sneaks in at the wire so that a total of $210,188.85 of the Transfers would meet the Subjective Prong.

3. **The Only Competent Testimony As To "Ordinary Business Terms" Within The Meaning Of 11 U.S.C. §547(c)(2) Was Offered By Atkinson, Who Testified That Any Payments Outside Of 33 To 64 Days Past Invoice Date Were Outside Of "Ordinary Business Terms".**

Despite the fact that Defendant bore the burden of proof to establish that the Transfers met both the Subjective and Objective Prongs of the "ordinary course" defense (see, e.g., Molded Acoustical Products, supra, 18 F.3d at 227), Defendant offered no expert testimony as to "ordinary business terms". Thus, the only expert testimony offered as to "ordinary business terms" was presented by Plaintiff's expert, Atkinson. As set forth in his expert report (Plaintiff's Trial Exhibit No. 16, pp. 9-10), Atkinson concluded that "[a]ll payments made outside of 33 to 64 days past invoice date are outside the ordinary business terms." (Id., p. 10, sixth full paragraph, last sentence.)

While Defendant's counsel may argue that Atkinson relied on data that was not restricted solely to the wholesale polymer distributor (railcar) industry, Molded Acoustical Products, supra, 18 F.3d at 224, holds that, given that the identification of the proper industry "would many times be problematic [, the courts should be] quite accommodating about what the proper industry is". As for Defendant's counsel's repeated attempts to establish problems as to the reliability of the Risk Management Association and Dunn & Bradstreet data upon which Atkinson relied, Plaintiff is confident that the Court saw these efforts for the inconsequential nitpicking they so clearly were.

More fundamentally, even if this Court completely rejected Atkinson's testimony (and it should not), that would only result in a trial record which lacked any competent evidence allowing the determination of the "ordinary industry terms" required under the Objective Prong.

Since Defendant bore the burden of establishing that the Transfers satisfied both the Subjective and Objective Prongs, the consequence of such a failure of proof would be the same as accepting Atkinson's opinion—namely:  Defendant's ordinary course defense would fail as to the entirety of all of the Transfers, all of which were made beyond the 33 to 64 day period to which Atkinson opined.

Defendant may argue that its witnesses testified that two of Goldmark's competitors, now all subsumed within Defendant's parent, Ravago, also had "normal" terms of 60 to 90 (or 95) days, but such a small sample, offered only by Defendant's own employees, cannot suffice as an adequate evidentiary basis for determining the "ordinary business terms" of an industry.  In re Toy King Distributors, Inc., 256 B.R. 1, 126 (Bkrtcy.M.D. Fla. 2000), the bankruptcy court rejected strikingly similar testimony as insufficient as follows:

> …TKA did not present any evidence beyond the adumbrated testimony of Horne and Morrow, representing Liberty and TKA respectively, that would enable the court to compare the subjective course of dealing between TKA and the debtor with an objective, normative, creditor's industry standard.  The testimony of Horne and Morrow was limited to the specific practices of Liberty, TKA, and the debtor rather than general practices in the retail toy industry or other relevant industry, whatever that might be.

> The court finds the testimony of Horne and Morrow, to the limited extent that it could be interpreted as describing an industry standard, to be both self-serving and insufficient to establish an objective industry standard.  Testimony of the defendants, even in the event that it does include evidence of industry practice, is 'inherently suspect because it is to be expected that testimony of an officer of the defendant would be favorable to defendant's position.'  *Ideal Security Hardware,* 186 B.R. at 239.  Moreover, the evidence's weight is so insubstantial as to fail to meet the preponderance of the evidence standard.  *See Anderson v. Ganis Credit Corp. (In re Weilert R.V., Inc.),* 245 B.R. 377, 386 (Bankr.C.D.Cal.2000)['H]owever broad an interpretation is applied, some proof of industry standard is warranted.']

> <u>In the absence of any evidence of an industry standard, the
> court is required to conclude that TKA failed to establish this
> element of the ordinary course defense.</u>  *See, e.g., Spirit Holding,*
> 214 B.R. at 901-02 [vague, generalized evidence of industry
> standard provided by an employee of defendant insufficient to
> establish industry norm]; *Ideal Security Hardware,* 186 B.R. at 239
> [defendant did not establish element of proof of the ordinary
> course business terms of the industry]; *Hovis v. Powers
> Construction Co. (In re Hoffman Associates, Inc.),* 194 B.R. 943,
> 955 (Bankr.D.S.C. 1995) [defendant could not prevail on its
> affirmative defense because there was a lack of credible evidence
> of industry norm].  (<u>Id</u>., 256 B.R. at 126; emphases added.)

<u>See also</u> <u>In re Contempri Homes, Inc.</u>, 269 B.R. 124, 127, 129-130 (Bkrtcy.M.D.Pa.2001)

[transferee did not meet burden under Section 547(c)(2) where only evidence presented to

support industry-wide practices consisted of transferee's general manager's testimony:  "Well we

used those kind of terms before when I was at North Branch, and we have the same type of terms

at Seven Day Wholesale."]; <u>In re Pearson Industries, Inc.</u>, 142, B.R. 831, 844-5

(Bkrtcy.C.D.Ill.1992) [court rejected testimony of transferee's sales manager that payments were

consistent with industry practices, stating:  "The testimony of [sales manager] was clearly that of

[an] interested part[y] and self serving.  This Court would not expect [his] testimony to be any

different."].

    In sum, regardless of whether this Court accepts or rejects Atkinson's opinion as to

ordinary course business terms, Defendant failed to meet its burden of establishing that any of

the Transfers, or any portion of any of the Transfers, satisfied the Objective Prong of the

ordinary course defense.  Accordingly, Defendant did not prevail on its ordinary course defense

with respect thereto; and, as a result, Plaintiff is entitled to be awarded the full amount sought of

$519,346.35 except to the extent that this Court finds that Defendant provided new value in excess of the stipulated new value amount (i.e., $234,353.90).

    **4.**     <u>**Even If The Transfers Had Been Made Within The Periods Established By The Subjective And Objective Prongs, All Of The Transfers Would Still Fail The Subjective Prong Because The Transfers Were, According To Defendant's Witnesses' Undisputed Testimony At Trial, Made As The Result Of Intense Collection Efforts Which Substantially Differed From Those Defendant Had Utilized During The Pre-Preference Period.**</u>

In addition to looking at the timing and/or method of payment in assessing whether an alleged preferential transfer meets the Subjective Prong of the ordinary course defense, the courts also commonly examine whether the debtor or creditor engaged in any unusual collection or payment activities. <u>Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.)</u>, 220 B.R. 1005, 1020-1 (B.A.P. 10th Cir.1998). <u>See generally</u> 5 <u>Collier on Bankruptcy</u> (15 Ed.Rev.) ¶547.04[2][9] at pp. 547-60 through 547-61.

As explained in <u>Collier on Bankruptcy</u>, <u>supra</u>, payments made in response to "unusual" collection efforts cannot be deemed to have been made within the ordinary course:

> *Unusual Collection Efforts or Payment Practices.*
> Payments made in response to "unusual" debt collection practices by the creditor are outside the scope of ordinary course of business. It seems clear from the legislative history that section 547(c)(2) should protect only those payments that do not result from unusual debt collection or payment practices….
>
> In many circumstances, a phone call or two demanding an overdue payment or threatening to delay further deliveries until overdue payments are made may be ordinary between the parties.
>
> <u>The court will normally compare the collection activities that preceded each challenged transfer with the pattern of collection activities occurring prior to the preference period to see if the collection activities that preceded the alleged preferences fall within that pattern.</u> In addition the court will examine and compare the relationship between such collection activity and the making of the challenged payment with the pre-preference period relationship between the collection activity and payment. <u>The</u>

> more intense the collection activity during the preference period
> the greater the likelihood that the activity will take the payment out
> of the ordinary course of business.  (Id., 5 Collier on Bankruptcy
> supra, at pp. 547-62 through 547-63; footnotes omitted; emphases
> added.)

In the instant case, Defendant, anxious to bolster its "new value" defense, emphasized
that (1) its decision to enter into a "Consignment Agreement" on May 26, 2005, with a first
release of goods shipped pursuant thereto on June 24, 2005 (the preference period started on June
18, 2005), effected a material charge in the prior course of dealing and (2) commencing with the
first release of "consigned" goods on June 24, 2005, and throughout the remainder of the
preference period, Defendant demanded, and received, a check in hand for a sufficient amount of
past due receivables to ensure that the subsequent release of further goods to Debtor, either later
than same day or the following day, would not result in Debtor's total accounts payable to
Goldmark exceeding Goldmark's $600,000 credit insurance limit as precondition to agreeing to
allowing Debtor access to good essential to Debtor's ability to keep its plant operating.  See, e.g.,
Trial Transcript, p. 145, line 25-p. 146, line 9 ["Q.  Okay.  And is there any doubt in your mind
that the release authorization--that the check came in on [June] 23rd before the release was given
on [June] 24th?  A.  [James Duffy] No, because it--it was the first car that we--we sold them
underneath, you know, this--this consignment agreement, and my instructions to Pete--were not
to release any material to Foss until it had a check in hand, period, or, you know, you weren't
going to have a job."].

Prior to the preference period, and the entry of the "Consignment Agreement", Foss
acquired title to the goods (i.e., resin) upon shipment.  As a result, if Goldmark had elected

simply to cancel the requirements contract and/or refused to ship any new resin, Foss would have

had sufficient time due to resin "in the pipeline" to seek a new source of supply and order and

receive resin from a new supplier before it had to shut down its plant for lack of resin to process.

As Joseph St. Martin testified at trial, Foss' "just in time" scheduling meant that even a short gap

in Foss'resin supply chain would require the plant to be shut down:

> Q.     Joe, tell me about the discussions that you had with--with Mr. Timson relative to this agreement.
>
> Q.[Sic--A.]     Well, after we talked about the fact that that May 18th order would--would--would be impossible to fill unless they paid--paid down, you know, the current balance, he told me that they probably couldn't pay the current balance before the ship date, which would have been in late May, so—
>
> Q.     Was that a concern to him?
>
> A.     Yes, it was a concern to him, and it was a concern to us.
>
> Q.     Why was it a concern to Mr. Timson at Foss?
>
> A.     <u>He wouldn't be able to get the resin to run his plant if we didn't ship it.</u>
>
> Q.     What do you mean by that?
>
> A.     <u>Well, in--order--if we--if we didn't ship it, he wasn't going to--he had a 6/21 delivery date, due date, on his--on his order, and if we didn't ship it in May, he wouldn't receive it to use on 6/21.</u>
>
> Q.     Because it took a period of time to deliver, is that right?
>
> A.     Yeah.
>
> Q.     And how long did it typically take to deliver—
>
> A.     Transit time was two to four weeks for his location. (Trial Transcript, p. 71, line 18-p. 72, line 15; emphases added.)

In short, even if the Transfers had been made within the permissible time periods established by both (1) the pre-preference period practice between the Debtor and Goldman and (2) ordinary business terms (and they weren't), the Transfers would still fail under the Subjective Prong because the testimony at trial established without dispute that, just before the preference period commenced, Goldmark, aware of and in response to Debtor's worsening cash flow problems, insisted on a material change to its relationship with Debtor (i.e., the entry into the Consignment Agreement) the purpose and effect of which was to put Debtor in a financial vise where Debtor either had to pay Goldmark's oldest invoice as a condition to obtaining the release of the resin necessary to keep its plant running or shut down the plant.  This is precisely the type of changed, coercive collection tactic arising and employed during the preference period that ipso facto establishes that any payments made in response thereto cannot be deemed to have been made "within the ordinary course".

**B.**    **The New Value Defense Issue**

The crucial issue with respect to Defendant's new value defense is the determination of the dates when the "value" represented by the four rail cars of the goods identified in Stipulated Fact 21 (the "Resin Product") is deemed to have been given by Goldmark to Debtor.  Plaintiff asserts that it is on May 27, 2005, the date the Resin Product was shipped to Debtor's rail siding in Hampton, New Hampshire.  If this is correct, all of the Transfers occurred almost a month after Goldmark's provision of the "new value" represented by the Resin Product; and, as a result, Defendant would not be entitled to any credit therefor.

Defendant contends, to the contrary, that the "new value" of the Resin Product was only rendered to Debtor when Debtor withdrew the Resin Product from Debtor's rail siding and was

invoiced by Goldmark therefor.  The withdrawals and invoices occurred on June 24, 2005 and June 30, 2005.  (Stipulated Facts 23 and 25.)

If the dates of the withdrawals and invoices are held to be the dates when the "new value" was provided to Debtor, then Defendant  will be entitled to a credit against the Transfers in the full amount of the value of the Transfers, or $353,519.25.[1]  In fact, however, the law, when applied to the evidence presented at trial, established that the "new value" was provided to Debtor at the time of the Resin Product's shipment on May 27, 2005.[2]

In particular, the law is settled that, under normal circumstances, the date of the shipment of goods is the date of the provision of the "new value" represented thereby.  See, e.g., In re Intercontinental Polymers, Inc., 359 B.R. 868, 8881 (Bkrtcy. E.D. Tenn. 2005) ["New value is given when the goods are shipped or given by the creditors rather than received by the debtor."]; In re Globe Building Materials, Inc., 334, B.R. 416, 426 (Bkrtcy. N.D. Ind. 2005) ["the date of shipment is the date of the provision of 'new value'"]; Rushton v. E & S Int'l Enters., Inc, (In re Eleva, Inc.), 235 B.R. 486, 489 (10th Cir. BAP 1999) ["The relevant date to determine when new value is given is the date of the shipment of the goods."].

While Defendant seeks to tie the date for the provision of "new value" to Goldmark's preparation of the invoices for the Resin Product, "[n]ew value under §547(c)(4) is considered on

---

[1]    While the total value of the four disputed new value shipments was $391,134 (see Stipulated Facts 23 and 25 and Plaintiff's Trial Exhibits 10 through 13), 11 U.S.C. §547(c)(4) requires that new value must be given "after" the preferential transfer against which the new value is sought to be offset.  As noted in Stipulated Fact 8, the only three Transfers received before all the disputed "new value" had been received totaled $353,519.25 (i.e., $117,363.75 + $117,572.00 + $118,583.50), thereby limiting the amount of the offset available to Defendant to that amount.

[2]    The latest Debtor could conceivably be deemed to have received the "new value" represented by the Resin Product was between June 16, 2005 and June 18, 2005, when the four rail cars of Resin Product arrived at Debtor's rail siding in Hampton, New Hampshire.  (Stipulated Fact 21.)  Again, however, these dates would have preceded all of the Transfers.

the date goods are provided or services performed and not on the date a creditor chooses to bill

the debtor for those goods or services." In re American Intern. Airways, Inc., 56 B.R. 551, 555

(Bkrtcy. E.D.Pa. 1986). As recently explained at length by the Seventh Circuit Court of Appeals

in In re Globe Bldg. Materials, Inc., 484 F.3d 946, 949-50 (7th Cir. 2007), the key is whether,

prior to the withdrawal of the inventory and Goldmark's issuance of an invoice therefor, Debtor

was already contractually obligated to pay for the Resin Product:

> "The critical issue here, as the bankruptcy judge recognized, is
> whether the components that RDI delivered after November 2
> provided new value to Globe. RDI claims that the district court
> erred in its 'new value' analysis in two respects: first, by
> concluding that a party does not provide 'new value' when it
> furnishes something of value under a pre-existing agreement with
> the debtor; and second, by ruling that a party does not provide
> 'new value' when the debtor does not use the transferred item in
> the manner that the debtor intended when it first sought the item.
> We address those two arguments in turn.
>
> RDI argues that Congress chose not to exclude existing contractual
> obligations from its definition of 'new value' in the Bankruptcy
> Code. We are not sure how it gleans that interpretation from the
> language of the statute, which we have reproduced above. To
> insist that 'new value' be 'new', is not reading an additional
> requirement into the statutory definition. As the trustee correctly
> points out, Congress intended the definition of 'new value' to
> codify the principle of consideration from contract law. In re
> Spada, 903 F.2d 971, 976 (3d Cir. 1990). That familiar principle
> requires 'consideration' to be something that the promisor is not
> already obliged to give to the promisee (that is, something
> additional or new); the "[p]erformance of a legal duty owed to a
> promisor … is not consideration." Restatement (Second) of
> Contracts §73.
>
> As of the beginning of November 2000, RDI already had an
> obligation to deliver the portion of the line equipment to Globe that
> it sent during November, and Globe already had an obligation to
> make its scheduled payment on the contract. Those obligations
> gave rise to a pre-existing set of possible remedies. If Globe had
> not made its November 2, 2000 payment, RDI could have availed
> itself of one of the remedies the Indiana version of the UCC
> recognizes, such as withholding delivery of additional goods.

[Citation omitted.] If RDI had learned of Globe's financial difficulties, then RDI could have suspended delivery until it received assurances from Globe that Globe was prepared to fulfill its own contractual obligations. [Citations omitted.] Or if Globe had told RDI that it would be unable to make the final payment under the contract, this anticipatory repudiation would have entitled RDI either to resort to any remedy for breach of contract or to suspend its own performance (here, delivery of goods)….

All of this goes to show that both Globe's obligation to pay and RDI's obligation to deliver the goods were anything but 'new' in November 2000….

RDI makes much of the statutory language defining 'new value,' but this definition does not help it. 'New value' does not include an obligation substituted for an existing obligation….

If RDI had decided to furnish something outside the confines of the contract to Globe, within the preference period, and Globe had paid for it, we would have a different case…. But under the contract the parties actually had, RDI's delivery during the preference period of equipment components it was obliged to furnish does not constitute 'new value.' (Id., 484 F.3d at 949-950; emphases added.)

In the instant case, it is stipulated that, on or about October 5, 2004, Debtor and Goldmark entered into a written anticipated requirements contract (the "Requirements Contract") under which "[Goldmark] agrees to sell and [Debtor] agrees to buy" during the period "January 1, 2005 to December 31, 2006" a minimum of two, and a maximum of four, "195,000 pound railcars [of Pinnacle Polymers 1517 or equivalent] to be delivered on a monthly basis." (Stipulated Fact 18 [Plaintiff's Trial Exhibit "1"].) It is further stipulated that on May 18, 2005, over a week before the Consignment Agreement on which Goldmark relies was entered into, Debtor issued its Purchase Order A72768 ("PO A72768") for a total of 760,000 pounds of Pinnacle Polymers 1517 to be delivered by June 21, 2005 to Debtor's Hampton, New Hampshire location at a total price of $372,400.00. (Stipulated Fact 20 [Plaintiff's Trial Exhibit "3"].)

Sometime between Debtor's issuance of PO A72768 on May 18, 2005 and May 27, 2005 (when the shipment of the Resin Product commenced), Goldmark, "pursuant to PO A72768" (Stipulated Fact 21), purchased four railcar shipments of Pinnacle Polymers' 1517 polymer resin product (i.e., the Resin Product). While it is further stipulated that, on or about May 26, 2005, Debtor and Goldmark entered into a Consignment Agreement under the terms of which legal title to the Resin Product remained in Goldmark until Goldmark authorized its release, the testimony at trial confirmed that: (1) the reason that the shift to a consignment agreement occurred was because Goldmark was unwilling to allow Foss' accounts receivable balance to exceed $600,000 because that was the limit of Goldmark's credit insurance; (2) the Resin Product had to be ordered 2 to 4 weeks before it was needed because it took that long for railcar shipment to be completed; (3) prices were fixed before and after the consignment agreement was entered into as of the date of shipment (approximately) because that is when Goldmark's acquisition cost from Pinnacle Polymers was fixed, regardless of whether prices went up or down before the goods were needed by Foss; (4) the underlying requirements contract remained in place insofar as it required Foss to order its requirements from Goldmark and Goldmark to fill the requirements orders (Trial transcript, p. 70, line 17- p. 71, line 7, and p. 110, line 10- p. 111, line 3); (5) Foss would draw from the railcars directly into its plant to keep manufacturing going (i.e., without being able to draw from the railcars at the point of need, the related plant operations would have to shut down); and (6) after the consignment agreement went into effect, Goldmark would only authorize the next release of Resin product upon its prior receipt of a check on the oldest outstanding prior invoice such that the issuance of a new invoice upon release would not result in the $600,000 credit insurance limit being exceeded.

Put the foregoing facts together, and it becomes clear that the underlying economic reality was that the entry into the Consignment Agreement was dictated by Foss' financial condition (cash flow) deteriorating to the point that, as payments after invoice slipped from an average of 74 days to 90 to 100, the total of Foss' accounts payable to Goldmark went from the cost of 2 months supply (under $600,000) to the cost of three months supply (over $600,000). Since this was over Goldmark's credit insurance limit, Goldmark had a choice between terminating the contract or tweaking it to "stretch" the period before invoices were sent out (thereby generating an accounts receivable for purpose of its credit insurance limit) by approximately a month so that three months of Resin Product could be shipped but only two months would be invoiced due the month delay after shipment until the invoice was issued. See Trial Transcript, p. 111, lines 4-18 [the effect of the Consignment Agreement was to stretch the transit terms of the requirements contract].

Accordingly, the entry into the Consignment Agreement was for the purpose of allowing Foss and Goldmark to keep the preexisting requirements contract in effect, for their mutual benefit, without Goldmark losing the benefit of its credit insurance by providing that the Resin Product would no longer be invoiced on shipment, but rather after delivery to Foss. The new structure had the additional benefit to Goldmark that it allowed Goldmark to force Foss to pay Goldmark's receivables rather than let them get even further behind because the month delay required for delivery of Resin Product meant that unless Foss paid Goldmark the amount necessary to keep its receivables balance under $600,000, Foss would have to shut down its operations because it would run out of Resin Product to process in its plant.

In other words, despite the fact that payment delays had been stretched during the preference period, the Foss/Goldmark relationship represents precisely the type of overreaching coercion by a creditor that had the debtor in an economic deathgrip that the preference laws are intended to prevent.  Further, given that the requirements contract remained in effect, Goldmark could not have decided after delivery at the siding to refuse to sell to Foss if Foss tendered the money because that would have allowed Goldmark to hold Foss up for increased prices due to Foss' reliance on its right to access the goods to keep its plant running upon payment of whatever prior invoice was required to get its balance under $600,000.  And certainly Foss had to buy the Resin Product that was delivered to its siding because the delay in shipment meant that it couldn't get other good delivered in time to keep operating its plant.  That is why there has never been an instance where a "consignee" said "never mind, prices have fallen, I'll buy elsewhere" (Trial transcript, p. 112, lines 12-25)-- what drives the economics is the delay in being able to secure replacement goods, which is much more significant than any possible decrease in prices in a relatively cheap commodity.

Thus, the reality is that the die was cast, and the economic substance of the  relationship dictated that the parties respective reciprocal obligations arose, at the point that the Resin Product was shipped regardless of when the invoices therefor were generated because (1) from the buyer's standpoint, the lead-time for replacing any shipment once it has arrived at its siding made any backing out of its purchase obligation unthinkable and (2) from the seller's standpoint, if it tried to remove the goods it had supplied under a requirements contract on the basis that it had "title", it would have been sued for, and lost, a multiple of damages when the buyer had to shut down its operations.

Or to put it another way, at the point where Foss' cash flow degenerated to the point where it needed to stretch its payments to Goldmark from 2 1/2 months after shipment to 3 1/2 months after shipment, Goldmark agreed to a restructure of the requirements contract, but only upon the condition that Foss enter into a consignment agreement the essential purpose of which was to allow Goldmark to condition Foss' ability to access Resin Product delivered to its siding under the requirements contract on Goldmark executing a release, which everyone understood was only to be given once Goldmark had received a payment on its oldest outstanding receivable so that the new invoice to be issued on release would not bring the accounts payable balance to over $600,000.  Since all Foss was required to do to get a release of Resin Product that was shipped to it under the requirements contract was to live up to its preexisting obligations under that contract, the parties' obligations under the requirements contract continued to arise on shipment, with invoicing delayed approximately a month, by reason of what in essence was an addendum via the Consignment Agreement that unless Foss had met its other, preexisting obligations before it wanted to access the newest shipment, Goldmark would be entitled to withhold access until it received adequate assurance that Foss would meet its most recent obligation to Goldmark by paying its balance to below $600,000.  A mutual obligation arises when an agreement is reached before either party commences performance, so the fact that Goldmark retained a right to withhold completing performance even after it had commenced (i.e., after the goods were shipped) if it did not receive adequate assurance of performance by Foss after delivery did not shift the time when the underlying obligation arose to the moment when adequate assurance is provided.

In sum, with respect to the Resin Product, which was ordered by Debtor from Goldmark <u>before the Consignment Agreement was ever executed</u>, Debtor and Goldmark had preexisting contractual obligations under the Requirements Contract and PO A72768.  Pursuant to <u>In re Globe Bldg. Materials, Inc.</u>, <u>supra</u>, Goldmark's subsequent conduct on June 24, 2005 and June 30, 2005 in accordance with such preexisting obligations cannot be deemed to constitute "new value" within the meaning of 11 U.S.C. §547(c)(4).

**C.**     <u>**Plaintiff Should Be Awarded Prejudgment Interest.**</u>

A trustee who successfully sues to recover a preferential payment is entitled to prejudgment interest at the rate established by federal statute from the date the complaint was filed.  <u>See, e.g.</u>, <u>Matter of Dayton Circuit Courts No. 2</u>, 80 B.R. 434 (S.D. Ohio 1987).  In the absence of substantial evidence showing that the equities required a different rate, the postjudgment rate specified in 28 U.S.C. §1962(a) should be applied.  <u>In re H.P. King Co., Inc.</u>, 64 B.R. 487, 491 (Bkrtcy. E.D.N.C. 1986).  As is established from the Federal Reserve website (http://www.federalreserve.gov/releases/h15/20070910/), that rate was 4.30%, so that if, as requested by Plaintiff, the judgment amount is $519,346.55, the amount of prejudgment interest through December 12, 2008 would be $27,777.21 (one year and 89 days), with interest accruing thereafter at the daily rate of $61.18329.

## III.
## CONCLUSION

Plaintiff should be awarded judgment against Defendant in the amount of $519,346.55,

with prejudgment interest accruing thereon as noted above from September 14, 2007, the date the

complaint was filed, until the date judgment is entered.


Dated:      December 12, 2008                    PACHULSKI STANG ZIEHL & JONES LLP



                                        */s/James K.T. Hunter*
                                        James K.T. Hunter (admitted pro hac vice)
                                        Jason S. Pomerantz (admitted pro hac vice)
                                        PACHULSKI STANG ZIEHL & JONES LLP
                                        10100 Santa Monica Blvd., 11th Floor
                                        Los Angeles, California  90067
                                        Telephone:     (310) 277-6910
                                        Facsimile:     (310) 201-0760
                                        Email:         jhunter@pszjlaw.com
                                                       jspomerantz@pszjlaw.com
                                        Lead Counsel for Plan Administrator
                                        */s/ Joseph A. Foster*
                                        Joseph A. Foster (#01572)
                                        Cheryl C. Deshaies (#05451)
                                        MCLANE, GRAF, RAULERSON &
                                             MIDDLETON, PA
                                        900 Elm Street, P.O. Box 326
                                        Manchester, NH  03105-0326
                                        Telephone:     (603) 625-6464
                                        Facsimile:     (603) 625-5650
                                        Email:         joe.foster@mclane.com
                                        Email:         cheryl.deshaies@mclane.com

                                        Local Counsel for Plan Administrator


### CERTIFICATE OF SERVICE

I, Joseph A. Foster, certify that on this 12th day of December 2008, I served a copy of the forgoing Plaintiff's Post-Trial Brief  via ECF to Gregory A. Moffett, Esq., counsel to the Defendant.


                              /s/ Joseph A. Foster
                              Joseph A. Foster