**2009 BNH 026**       Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                                    Bk. No. 05-13724-JMD
                                                                          Chapter 11
Felt Manufacturing Co., Inc.,
f/k/a Foss Manufacturing Co, Inc.,
              Debtor


Lawrence E. Rifken,
Plan Administrator and Trustee of the
Felt Manufacturing Co., Inc. Liquidating Trust,
              Plaintiff,

v.                                                                        Adv. No. 07-1170-JMD

Entec Distribution, LLC,
f/k/a Goldmark Distribution, LLC,
f/k/a Goldmark Distribution, LLD (DE),
f/k/a Goldmark Distribution, Inc.,
              Defendant


*Robert J. Feinstein, Esq.*               *Joseph A. Foster, Esq.*
*James K.T. Hunter, Esq.*                 *Cheryl C. Deshaies, Esq.*
*Jason S. Pomerantz, Esq.*                *McLane, Graf, Raulerson & Middleton, P.A.*
*Pachulski, Stang, Ziehl & Jones LLP*     *Manchester, New Hampshire*
*Los Angeles, California*                 *Attorneys for Plaintiff*
*Attorneys for Plaintiff*

*Gregory A. Moffett, Esq.*
*John M. Sullivan, Esq.*
*Joshua E. Menard, Esq.*
*Preti Flaherty Beliveau & Pachios LLP*
*Concord, New Hampshire*
*Attorneys for Defendant*

## MEMORANDUM OPINION

## I. INTRODUCTION

This adversary proceeding is an action under §§ 547 and 550 of the Bankruptcy Code[1] to avoid and recover preferential transfers purportedly made by a corporate debtor shortly before it filed for chapter 11 bankruptcy. The debtor manufactured non-woven fabrics for a variety of industries. Its products were used in cars, crafts (i.e., boats and RVs), and other industrial items. The defendant supplied raw polymer resin for use in the debtor's manufacturing process. As part of that business relationship, the debtor regularly paid the defendant for shipments of new resin, and some of those payments form the origin of this adversary proceeding.

At the beginning of the trial, the parties stipulated that the plaintiff, administrator of the surviving liquidating trust of the debtor, had established a prima facie case and proved all the elements for its preferential transfer claim under § 547. Therefore, the only issues tried were the defendant's "ordinary course of business" and "new value" defenses under § 547(c)(2) and (c)(4).

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. BACKGROUND

---

[1] In this opinion the terms "Bankruptcy Code," "section" and "§" refer to title 11 of United States Code, 11 U.S.C. § 101 et seq., prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8.

Lawrence E. Rifken ("Rifken"), the plaintiff in this adversary proceeding, is the plan administrator and trustee of the surviving liquidating trust of the Debtor, Felt Manufacturing Co., Inc., formerly known as Foss Manufacturing Co., Inc.  Rifken sued Entec Polymers, LLC, the successor to Goldmark Distribution, Inc. ("Goldmark"),[2] because the Debtor sent Goldmark several payments within ninety days of filing its bankruptcy case.  The Debtor filed for chapter 11 bankruptcy on September 16, 2005.  Therefore, the ninety-day preference period for purposes of § 547(b) started on June 18, 2005.  Rifken seeks to recover $519,346.55, which represents the disputed amount of six transfers the Debtor made to Goldmark within the preference period.[3] The Court held a one-day trial, after which it took the case under submission.

### A.  The Debtor's industry and the relevant parties

The Debtor was a privately-held manufacturer of non-woven fabrics, based in Hampton, New Hampshire.  The Debtor took basic petrochemical materials or raw polymer resins, such as polyester or polypropylene pellets, and produced a wide range of plastic products.  For example, it had an automotive unit that made interior trims for vehicles, i.e., floor carpeting, headliners, and hood and truck liners.  It also produced, among other things, decorative fabrics, such as acoustic wall coverings, boat and RV interiors, felt and craft products for sewing supplies, and technical products for the medical and apparel industries.

Goldmark was a distributor of polymer resin.  It bought resin from major chemical companies and sold it to companies like the Debtor for use in manufacturing plastic products.

---

[2]  Although Entec is the true defendant, the transactions at issue in this proceeding were between the Debtor and Entec's predecessor Goldmark Distribution, Inc.  Accordingly, the defendant shall be referred to as Goldmark in this opinion.

[3]  The six transfers actually totaled $753,700.45, but the parties stipulated that Goldmark provided new value under § 547(c)(4) at least in the amount of $234,353.90.

As a distributor, Goldmark purchased product from various suppliers.  Raw polymer resin typically comes in small pellet-form and is packaged in various ways, from 50-pound bags to bulk trucks and railroad cars.  For large manufacturers and distributors, resin is typically only transported in railcars.  These bulk quantities are shipped directly to Goldmark's customer by its supplier.  The supplier readies each shipment by blowing the raw resin pellets into railcars using a vacuum system.  These railcars usually have rounded sides and are shaped like gas tankers.  When filled with resin, they can weigh almost 200,000 pounds.  On the receiving end, resin buyers, i.e., the manufacturers, usually have a similar vacuum system that extracts the resin from railcar shipments that typically dock next to or near a buyer's manufacturing facility.  Goldmark bought resin from a number of companies, one of which was Pinnacle Polymers ("Pinnacle"), a Louisiana-based resin producer.  In the transactions in this case, Goldmark purchased resin from Pinnacle, and the resin was shipped directly from Pinnacle to the Debtor's facility in New Hampshire.

### B.  The business relationship between the Debtor and Goldmark

In October 2004, the Debtor and Goldmark signed a written anticipated requirements contract (the "Requirements Contract") for the period of January 1, 2005 to December 31, 2006.[4] Under the Requirements Contract, Goldmark agreed to sell and the Debtor agreed to buy between two and four bulk railcars per month of a particular resin, Pinnacle Polymers 1517 polymer resin.  The Requirements Contract also provided that the resin would be shipped by railcar and all shipments would be sold "F.O.B. Pinnacle Polymers Plant."  In other words, Goldmark's delivery obligation was satisfied when the resin was shipped from Pinnacle's plant

---

[4]  See Doc. No. 24, Am. Final Joint Pretrial Statement ¶ 18; Pl's Ex. 1.

in Louisiana.  The Requirements Contract further indicated that all of the Debtor's purchase orders were subject to Goldmark's written acceptance, and Goldmark could revise the credit terms at its option to protect its interest.  Joseph St. Martin, Goldmark's vice president at the time, testified that Goldmark typically limited the amount of credit it extended to customers and that Goldmark would change credit terms, decline delivery, or sell on a cash basis if it had concerns about a customer.  The Debtor had a $500,000 credit limit from Goldmark.

On May 18, 2005, the Debtor sent a purchase order to Goldmark for some resin product. Goldmark noticed that the May 18 order would put the Debtor close to or above its credit limit. For insurance reasons—and concerns about its own credit—Goldmark could not sell any more resin to the Debtor until the Debtor first paid down its credit line.  Sometime shortly after the May 18 order, St. Martin spoke with the representatives from the Debtor and explained that Goldmark could not sell the Debtor any more resin until the Debtor made payments on old invoices to reduce its credit balance.  The Debtor's purchasing manager told St. Martin that the Debtor probably could not make any payments until later that month, which might delay production if Goldmark would not ship any resin.  The parties negotiated and, on May 25, 2005, the parties entered into a consignment agreement (the "Consignment Agreement").[5]  Goldmark understood the Consignment Agreement as a way to continue helping the Debtor get the resin it needed for its business, stay within its credit limit, and have inventory on site that it did not have to pay for until it actually needed the resin.  The Consignment Agreement changed the buyer-seller relationship.  Before the Consignment Agreement, when the Debtor sent a purchase order, Goldmark would buy the resin, have Pinnacle ship it, and then invoice the Debtor on the date of

---

[5]  See Def.'s Ex. 104.  Although the Consignment Agreement exhibit is an unsigned copy, the trial testimony and evidence establishes that both parties later signed it.

shipment.  Under the Consignment Agreement, however, instead of sending an invoice at the time each railcar was shipped, Goldmark would not send an invoice until it received written authorization from its own credit department that the Debtor's payment for a particular railcar had been received.  Goldmark would also send a release notice to the Debtor once it received payment that authorized the Debtor to extract resin from a paid-for railcar.  After the release notice was given, Goldmark would send an invoice that same day.

The Consignment Agreement also changed the sale date from the date Pinnacle shipped each railcar to the date the Debtor extracted the resin from each railcar that was sitting at the Debtor's rail siding at its manufacturing facility.  The railcar transit time from Pinnacle to the Debtor's facility was about two to four weeks.  So, instead of billing the Debtor on the day the resin shipped, Goldmark would not bill until at least two to four weeks later, after the railcar reached the Debtor's facility.  Thus, Goldmark understood that it still owned the shipped resin sitting at the Debtor's facility until Goldmark authorized the release of each railcar and "sold" the resin to the Debtor.

The Consignment Agreement also provided that the resin would only be released after Goldmark's credit manager received proof of the Debtor's payment on outstanding invoices and gave written authorization.  The Debtor's payment had to be received—in hand or in the bank—before Goldmark authorized the release of each railcar of resin.  The Debtor had to pay enough to purchase one entire railcar, so each release covered only one railcar at a time.  Despite the terms of the Consignment Agreement, Goldmark released resin it had shipped to the Debtor's New Hampshire facility only after the Debtor had made payments on prior invoices under the pre-consignment terms.  After receiving a payment on an old invoice for at least the amount of a

6

railcar located at the Debtor's facility, Goldmark would release a designated railcar to the Debtor and invoice the Debtor for that shipment.

### C.  The new value evidence

Goldmark and the Debtor continued their business relationship under the terms of the Consignment Agreement.  Sometime between May 18, 2005 and May 27, 2005, after the Debtor sent its May 18 order, Goldmark bought four railcar shipments of resin from Pinnacle and had Pinnacle ship the resin from its Louisiana plant to the Debtor's facility on May 27, 2005.  Those four railcars arrived at the Debtor's rail siding between June 16, 2005 and June 18, 2005.

The Debtor then sent a payment, and, on June 23, 2005, Goldmark received the Debtor's check for $117,363.75, the first of the alleged preference payments.[6]  The next day, Goldmark authorized the Debtor to withdraw resin from one railcar, and Goldmark issued an invoice for that railcar for $92,825.00.[7]  Subsequently, the Debtor sent two checks to Goldmark for $117,572.00 and $118,583.50, the second and third alleged preference payments.[8]  Goldmark received the two checks on June 30, 2005, and it sent to the Debtor a release authorization form the same day, allowing the Debtor to extract resin from the three remaining railcars.  Goldmark then issued its invoices for $92,825.00, $102,882.00, and $102,596.00, the value of the resin in the railcars.  The Debtor then withdrew the resin from those three railcars after it was authorized.[9]  The Debtor subsequently sent three more checks to Goldmark on August 4, August

---

[6]  The $117,363.75 payment was not the value of one railcar from the May 18 order.  The payment was for an older order.  But it paid down the Debtor's credit line with Goldmark and allowed the Debtor to withdraw resin under the Consignment Agreement's terms.

[7]  See Pl's Ex. 10.

[8]  Again, these two checks paid Goldmark for two older orders made by the Debtor.

[9]  See Pl's Exs. 11, 12, & 13.

12, and September 2, 2005, in amounts of $112,860.00, $143,140.00, and $144,181.20, respectively.  Those were the remaining three alleged preference payments.

Goldmark also sent four more railcars of resin, which the parties agree provided new value and entitles Goldmark to a credit against any preference liability because the Debtor never made payments on the shipments before filing for bankruptcy.  Those four shipments—$94,728.00, $94,704.00, $22,736.00 and $22,185.90—total $234,353.90, and Goldmark provided new value to the Debtor in that amount.

As the record demonstrates, during the ninety days before bankruptcy, the parties engaged in many transactions under the Consignment Agreement.  The Court summarizes those transactions below:

| Check date | Check receipt date | Goods release date | Payment amount | Goods shipped | Net Value of Payments Less Shipments |
|---|---|---|---|---|---|
| 6/6/05 | 6/23/05 | | $117,363.75 | | $117,363.75 |
| | | 6/24/05 | | $92,825.00 | $24,538.75 |
| 6/24/05 | 6/30/05 | | $117,572.00 | | $142,110.75 |
| 6/28/05 | 6/30/05 | | $118,583.50 | | $260,694.25 |
| | | 6/30/05 | | $102,882.00 | $157,812.25 |
| | | 6/30/05 | | $92,825.00 | $64,987.25 |
| | | 6/30/05 | | $102,596.00 | ($37,608.75) |
| 8/4/05 | 8/5/05 | | $112,860.00 | | $112,860.00 |
| 8/12/05 | 8/26/05 | | $143,140.00 | | $256,000.00 |
| | | 8/26/05 | | $94,728.00 | $161,272.00 |
| | | 8/29/05 | | $22,736.00 | $138,536.00 |
| 9/2/05 | 9/6/05 | | $144,181.20 | | $282,717.20 |
| | | 9/8/05 | | $94,704.00 | $188,013.20 |

| | | 9/10/05 | | $22,185.90 | $165,827.30 |
|---|---|---|---|---|---|
| Totals | | | $753,700.45 | $625,481.90 | $165,827.30 |

### D.  The ordinary course testimony and evidence

The parties stipulated to the payment history between the Debtor and Goldmark dating back to October 14, 2004,[10] which allows the Court to compare the payment aging for the pre-preference and preference periods to help its ordinary course analysis.  The parties' payment history exhibit lists twenty pre-preference period payments with ages from 67 to 97 days, and nine preference period payments with ages from 74 to 141 days.[11]

Goldmark called three witnesses in support of its position that the Court should find that any payments the Debtor made to Goldmark falling within the 60 to 95 day range meet the ordinary course defense under § 547(c)(2).  First, St. Martin testified that Goldmark's bulk railcar customers, as well as other similar companies in the same industry that St. Martin had worked for, were typically given a payment range of 60 to 95 days.  Goldmark, like other distributors, has different payment terms for small quantity purchasers and bulk railcar purchasers because customers who buy large, railcar quantity sizes of resin were typically commodity-type businesses that worked on smaller margins, relied on volume business, and had large cash requirements, resulting in tighter cash flow.  St. Martin testified that Goldmark had several other bulk railcar customers and they were given the same 60 to 95 day payment terms.

---

[10]  See Pl's Ex. 2.

[11]  Exhibit 2 actually lists eleven preference period payments, but the parties agree that two payments of $1,980.00 and $1,973.50 were not ordinary course payments and those are not disputed in this case.

Next, James Duffy, the former president and CEO of Goldmark, testified to similar facts. Duffy has worked for many years in the polymer distribution industry.  In the late 1980s, he worked for a polymer distributor and was responsible for several bulk railcar customers, each of whom was given 60 to 95 day payment terms.  Duffy later started his own polymer distributor and likewise gave his customers the same payment terms.  Duffy then began working for Goldmark.  Goldmark offered the same 60 to 95 day payment terms because, as Duffy explained, those were the industry standard and if Goldmark wanted to do business, it had to operate within those terms.  In 2006, Entec bought Goldmark, and Duffy later also became president of Entec. Duffy testified that Entec also currently extends the same 60 to 95 day payment terms.

Lastly, John Myers, a former credit analyst and manager of H. Muehlstein, a competitor of Goldmark, and now credit manager for Ravago, a multi-billion dollar polymer distribution company and parent company of Entec and H. Muehlstein, testified about payment terms within the polymer industry.  At H. Muehlstein, Myers dealt with the credit and payment terms of the company's customers, most of whom were bulk railcar customers.  Myers testified that H. Muehlstein gave its bulk railcar customers payment terms of 60 to 90 days and that Ravago also extends the same payment terms.  He explained that the reason for that range of days was primarily because of the time delay in getting the product to customers using railroad lines. Myers also explained that the companies he previously worked for were forced to offer these terms because other distributors were offering the same.  In other words, the customers would just buy from some other company if the distributor insisted on shorter payment terms.

Rifken called one expert witness, Michael Atkinson, managing director of Protiviti, Inc. Atkinson frequently provides bankruptcy consulting, financial analysis, and business valuations

for troubled companies and has been retained as a preference and fraudulent conveyance expert in many bankruptcy cases.  Atkinson submitted an expert report and testified at trial that he believes the parties had a shorter ordinary course payment range of 67 to 80 days after the invoice date, and that the Debtor's industry had a shorter ordinary course payment range of 33 to 64 days after the invoice date.[12]  Therefore, according to Atkinson, the entire net disputed amount of $519,346.55 is a recoverable preference liability.[13]

The parties stipulated to the details of the six transfers at issue as follows:[14]

| Check No. | Invoice date | Invoice amount | Check date | Receipt date | Check amount | Days to pay |
|---|---|---|---|---|---|---|
| 93652 | 3/30/05 | $117,363.75 | 6/6/05 | 6/23/05 | $117,363.75 | 85 |
| 93912 | 3/31/05 | $117,572.00 | 6/24/05 | 6/30/05 | $117,572.00 | 91 |
| 94006 | 3/31/05 | $118,583.50 | 6/28/05 | 6/30/05 | $118,583.50 | 91 |
| 94486 | 4/22/05 | $112,860.00 | 8/4/05 | 8/5/05 | $112,860.00 | 105 |
| 94583 | 4/7/05 | $26,697.00 | 8/12/05 | 8/26/05 | $143,140.00 | 141 |
|  | 4/29/05 | $112,489.50 |  |  |  | 119 |
|  | 7/1/05 | $1,980.00 |  |  |  | 56 |
|  | 7/1/05 | $1,973.50 |  |  |  | 56[15] |
| 94797 | 5/27/05 | $22,941.80 | 9/2/05 | 9/6/05 | $144,181.20 | 102 |
|  | 6/8/05 | $28,414.40 |  |  |  | 90 |
|  | 6/24/05 | $92,825.00 |  |  |  | 74 |

---

[12]  See Pl's Ex. 16.

[13]  Id.

[14]  See Doc. No. 24, Am. Final Joint Pretrial Statement ¶ 8; Pl's Ex. 2.

[15]  The parties stipulated that the two payments of $1,980.00 and $1,973.50 invoiced on July 1, 2005, were not ordinary course payments.

## III.  DISCUSSION

Section 547(b) of the Bankruptcy Code guards against favoritism in the face of looming insolvency by providing that certain payments made within ninety days before the debtor files for bankruptcy may be voidable as preferences.  Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 109 (1st Cir. 1997).  But this rule also has several exceptions, two of which are raised by Goldmark.

### A.  Ordinary course of business defense — § 547(c)(2)

Section 547(c)(2) provides that a bankruptcy trustee may not avoid a preference-period transfer to the extent that such transfer was

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).[16]  The ordinary course exception promotes leaving normal financial relations undisturbed in accordance with § 547's general policy of discouraging "unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."  Healthco Int'l, 132 F.3d at 109 (quoting H.R. Rep. No. 595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6329).  The defendant must prove each element by a preponderance of the evidence.  Howard v.

---

[16]  The Court cites the pre-BAPCPA version of § 547(c)(2) because that prior version applies to this case.  Although the parties disputed the issue in pretrial motions, Goldmark later conceded the point because of BAPCPA's October 17, 2005 general effective date.  Although this adversary was filed on September 14, 2007, the Debtor filed its bankruptcy petition in the main case on September 16, 2005.  Courts view the commencement date of the main case, not the date of the adversary, as the general controlling date for whether the BAPCPA amendments apply.  See, e.g., Guerriero v. Kilroy (In re Kilroy), 354 B.R. 476, 496 & n.9 (Bankr. S.D. Tex. 2006).  Significantly, BAPCPA amended § 547(c)(2) by changing the "and" between subsections (B) and (C) to  "or," thus making the prongs alternative and easier for preference defendants to make out an ordinary course defense.  But Goldmark must prove all three prongs to prevail.

Bangor Hydro Elec. Co. (In re Bangor & Aroostook R.R. Co.), 324 B.R. 164, 168 (Bankr. D. Me. 2005). Because the statute does not define "ordinary course of business," courts generally focus on the amount transferred, the timing of the payment, the historic course of dealings between the debtor and the transferee, and the circumstances under which the transfer was made. Id.

The parties do not dispute the first element of the ordinary course defense under § 547(c)(2)(A)—that the transfers in question were payments on debts incurred in the ordinary course of business or financial affairs between the parties.[17] Thus, the Court only needs to decide the second and third prongs of the defense.

### 1. The "subjective" element — § 547(c)(2)(B)

Under § 547(c)(2)(B), a defendant must show that the debtor's transfers were made in the ordinary course of both its business and the debtor's business. Bangor & Aroostook, 324 B.R. at 168. This "subjective" element focuses on the parties relationship with each other. Id. As such, the court's inquiry is "peculiarly factual" and case-specific. First Software Corp. v. Curtis Mfg. Co., Inc. (In re First Software Corp.), 81 B.R. 211, 213 (Bankr. D. Mass. 1988).

Courts frequently first look to an established "baseline of dealing" to compare transfers made during the preference period with the parties' prior course of dealings. Cassirer v. Herskowitz (In re Schick), 234 B.R. 337, 348 (Bankr. S.D.N.Y. 1999). Although some courts indicate that this is a creditor's burden to establish, see id., the parties here seem to agree on what was normal between them before the preference period. And the parties already stipulated

---

[17] See Doc. No. 24, Am. Final Joint Pretrial Statement ¶ 14.

to their payment history going back to October 2004, about a year before the Debtor filed for bankruptcy.[18]

The most common factors courts rely on for determining whether payments are ordinary include: (1) the length of time the parties were engaged in the transactions at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activities; and (4) the circumstances under which the payment was made.  5 Lawrence P. King, Collier on Bankruptcy ¶ 547.04[2][a], at 547-60 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2009); see Bangor & Aroostook, 324 B.R. at 168.  But the overall controlling consideration is whether the transactions between the debtor and the creditor both before and during the 90-day preference period were consistent.  See Healthco Int'l, 132 F.3d at 110 ("the hallmark of a payment in the ordinary course is consistency with prior practice").

"Even if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties."  Waldschmidt v. Ranier (In re Fulghum Constr. Corp.), 872 F.2d 739, 743 (6th Cir. 1989).  So if late payments were the standard course of dealing between the parties, then late payments are considered within the ordinary course of business under § 547(c)(2).  Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.), 888 F.2d 42, 44 (6th Cir. 1989).  In the end, though, what controls the analysis is the actual course of dealing between the parties, not the stated terms governing their relationship.  Bangor & Aroostook, 324 B.R. at 169; see Kleven v. Household Bank FSB, 334 F.3d 638, 642-43 (7th Cir.

---

[18] See Pl's Ex. 2.

2003) (noting that the parties' history of dealing is the strongest factor to determine the ordinary course of business between the parties).

The Court confines its analysis to those factors on which the parties disagree.[19]

### a. Timing of payments[20]

The parties spend the bulk of their energy arguing over whether the aging of payments in the preference period proves that those payments were not in the ordinary course of business. In total, the parties' payment history shows twenty pre-preference period payments aging from 67 to 97 days and nine preference period payments aging from 74 to 141 days. Goldmark contends that Duffy and St. Martin testified that it had a 60- to 95-day payment term with the Debtor, which supports a finding that 60 to 95 days was the ordinary course of business between the parties under the subjective element. Goldmark believes that Duffy and St. Martin's personal knowledge of the parties' business relationship and payment terms provides greater evidentiary support for establishing the actual business terms between the Debtor and Goldmark during the relevant time period. In response, Rifken relies on Atkinson's testimony and expert report that the ordinary course of business between the Debtor and Goldmark involved a 67- to 80-day payment term. Rifken therefore contends that, based on Atkinson's opinion, all but a portion of one of the disputed transfers fails the subjective element.

---

[19] The parties do not dispute that the transfer amounts were not in the ordinary course. Likewise, the parties do not dispute that the length of their relationship has any bearing on the outcome. Courts usually consider that factor relevant only if the parties' pre-preference relationship was relatively new or only involved a few transactions.

[20] The Court asked both parties to address in their post-trial briefs the policy of § 547(c)(2)'s ordinary course defense and whether preference period payments made later, rather than earlier, still creates preference liability. The Court's review of the law on this issue makes clear that late payments can be preferences. See, e.g., In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1032 (7th Cir. 1993).

"The vast majority of ordinary course of business cases deal with payments that are made later than [what] the express written terms require."  5 Collier on Bankruptcy ¶ 547.04[2][a], at 547-61.  Courts examining the timing of payments compare the pre-preference period with the preference period to determine what falls outside of "ordinary" between the parties.

Here, the dealings between the parties changed during the preference period.  But Atkinson's testimony and report reads the payment range too narrowly.  Providing a slew of various statistics, Atkinson opines that payments outstanding for 67 to 80 days were the norm.[21]  However, the actual range of aged payments during the pre-preference period and the testimony at trial support a finding that 60 to 95 days was "ordinary" between these parties.  Although many payments were made between 67 to 80 days, several were still made beyond that term (i.e., 86, 87, 88, 90, and 97 days).  Atkinson's report tries to attach significance to this by stating that 75% of the pre-preference period payments fell within 67 to 80 days.  But the touchstone is "some consistency" not rigid similarity.  J.P. Fyfe, Inc. of Florida v. BradCo Supply Corp., 96 B.R. 474, 476-77 (D.N.J. 1988), aff'd 891 F.2d 66 (3d Cir. 1989).  Preference law should not punish businesses from exercising some limited flexibility in their payment relationship.  Thus, the Court finds that 60 to 95 days was "ordinary" between these parties under the subjective element.  Nevertheless, compared with the preference period payments, that range still excludes several payments from the "ordinary course" defense because they fall outside of that window.  The payments with ages of 102, 105, 119, and 141 days, totaling $274,988.30, were not "ordinary" between the parties.

---

[21] See Pl.'s Ex. 16 at 4, 7.

16

**b.  Unusual collection efforts or payment practices**

Rifken nonetheless has a fallback position to cover the remainder of the preference period payments—those that still fell within the 60 to 95 day range.  He argues that <u>all</u> of the preference period transfers still fail the subjective element because the transfers were made as the result of Goldmark's intense collection efforts.  Rifken contends that the Consignment Agreement changed the parties' course of dealing because Goldmark wanted to protect its credit insurance limit on the Debtor's account by changing the terms of shipping, payment, and release of goods.

"[W]henever [a] bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts."  <u>Marathon Oil Co. v. Flatau (In re Craig Oil Co.)</u>, 785 F.2d 1563, 1566 (11th Cir. 1986).  Payments in response to a creditor's unusual debt collection efforts fall outside the scope of the ordinary course defense.  <u>Ellenberg v. Plaid Enters., Inc. (In re T.B. Home Sewing Enters., Inc.)</u>, 173 B.R. 790, 796 (Bankr. N.D. Ga. 1993).  As with the aging of payments, courts normally conduct a comparative analysis, looking at collection efforts in both the preference and pre-preference periods, to determine if the preference period collection efforts significantly deviate from the ordinary course between the parties.  "The more intense the collection activity during the preference period the greater the likelihood that the activity will take the payment out of the ordinary course of business."  5 <u>Collier on Bankruptcy</u> ¶ 547.04[2][a], at 547-63.  Courts have not articulated what types of collection efforts suffice, only that the efforts be unusual between the parties.  So the analysis is case by case, focusing on the particular circumstances.

17

Here, the Court finds that the Consignment Agreement, as actually implemented by the parties, altered their previous relationship so that any payments under that agreement were not in the ordinary course.  Although one could characterize the Consignment Agreement as a consensual agreement to provide both the Debtor and Goldmark with certain benefits, the circumstances under which it was drafted and signed suggest otherwise.

Shortly before the parties signed the Consignment Agreement, Goldmark knew that the Debtor was having financial trouble.  In mid-May 2005, Goldmark saw that the Debtor was close to its credit limit.  In response, it refused to sell any more resin until the Debtor made some payments.  Discussions between St. Martin and the Debtor's purchasing manager revealed that the Debtor could not make payments until later in the month, in which case Goldmark's refusal to ship could delay the Debtor's production.  And if Goldmark did not ship, the Debtor could not run its plant.  Although Goldmark characterizes the Consignment Agreement as more of a mutually beneficial modification of the Requirements Contract, the practical effect was to protect Goldmark's own financial position with the Debtor.

Under the Consignment Agreement, Goldmark shipped orders of resin to the Debtor's New Hampshire facility and allowed the resin to sit at the facility while it remained Goldmark's property.  The Debtor could not access the resin without Goldmark's express consent.  And Goldmark would not give consent until it received payment on outstanding invoices.  Admittedly, the Debtor agreed to the terms, but in reality it had little to no choice in the matter.  Thus, although the Consignment Agreement benefited the Debtor by effectively eliminating the two- to four-week transit time and making delivery instantaneous, Goldmark still increased its

18

economic leverage by making sure it would not be caught with a customer over its credit limit.[22]
The parties deviated from their ordinary practices when they signed the Consignment Agreement
and began paying and shipping goods under new terms designed to protect Goldmark.  A debtor
that deviates from its customary practices to favor a select creditor prefers one over many, and
that conduct is the type the Bankruptcy Code's drafters intended to curtail.  See Healthco Int'l,
132 F.3d at 110.

     Under similar circumstances, courts examining unusual collection efforts have
considered whether the creditor exercised leverage and increased its own security and safety.
See, e.g., Prod. Steel, Inc. v. Sumitomo Corp. of Am. (In re Prod. Steel, Inc.), 54 B.R. 417, 423
(Bankr. M.D. Tenn. 1985); see also Xtra Inc. v. Seawinds Ltd. (In re Seawinds Ltd.), 91 B.R. 88,
92 (N.D. Cal. 1988) (creditor engaged in unusual collection practices by using economic
pressure to obtain payment as soon as possible by terminating contracts, demanding immediate
payment, and demanding return of equipment), aff'd 888 F.2d 640 (9th Cir. 1989).  And while
Goldmark may have believed it was trying to protect its own interests without harming the
Debtor, "[l]ack of harm is not the standard" for the ordinary course defense.  Official Comm. of
Unsecured Creditors of 360networks (USA), Inc. v. U.S. Relocation Servs., Inc. (In re
360networks (USA), Inc.), 338 B.R.194, 211 (Bankr. S.D.N.Y. 2005).

     For those reasons, the Court finds that the Consignment Agreement—and any payments
under it which fell within the preference period—represented an unusual collection effort
between the parties.  Thus, the disputed payments within the preference period were not in the

---

     [22] See Def.'s Ex. 105, Aff. of Joseph St. Martin ¶ 5 ("Under no circumstances was [the Debtor]
entitled to withdraw, remove, or use any of Goldmark's consigned resin products without first obtaining
Goldmark's authorization.").

ordinary course of business between Goldmark and the Debtor under § 547(c)(2)(B).   Because the Court finds that Goldmark failed to prove the subjective element under § 547(c)(2)(B), the Court need not address whether the transfers were made according to ordinary business terms within the industry under § 547(c)(2)(C).

### B.  New value defense — § 547(c)(4)

Goldmark argues that the transfers are nonetheless protected by § 547(c)(4) because it provided new value—here, the value of four resin shipments.  The parties agree that Goldmark provided $234,353.90 in new value to the Debtor.[23]  But Goldmark believes it provided $391,128.00 in additional new value.

Section 547(c)(4) provides that a trustee may not avoid a preference-period transfer to the extent that such transfer was

> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor–
> (A) not secured by an otherwise unavoidable security interest; and
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4).[24]  The creditor must therefore meet its burden of proof and demonstrate by a preponderance of the evidence that: (1) it received a transfer that is otherwise avoidable as a preference under § 547(b); (2) after receiving the preferential transfer, it provided new value to the debtor on an unsecured basis; and (3) the debtor did not compensate it with an otherwise unavoidable transfer for the new value.  Peltz v. Merisel Americas, Inc. (In re Bridge Information Sys., Inc.), 383 B.R. 139, 152 (Bankr. E.D. Mo. 2008).

---

[23]  See Doc. No. 24, Am. Final Joint Pretrial Statement ¶ 28, 29.

[24]  New value "means money or money's worth in goods, services, or new credit . . . that is neither void nor voidable by the debtor or the trustee under any applicable law."  11 U.S.C. § 547(a)(2).

In other words, even though a creditor received a preference, it "may still offset against a preference claim any subsequent unsecured credit which was extended to the debtor."  5 <u>Collier on Bankruptcy</u> ¶ 547.04[4][a], at 547-73.  The new value exception encourages creditors to work with troubled companies and removes the unfairness of allowing the trustee to void all transfers made by the debtor to a creditor during the preference period without also giving corresponding credit to the preference defendant for its subsequent advances of new value to the debtor that were never paid.  <u>Id.</u>  Courts examining a new value defense normally have to consider the timing of the payment, the timing for when new value was given, and how the new value is applied to preceding payments.

### 1.  The timing of payment

Courts consistently hold that for new value purposes under § 547(c)(4), the transfer involving a payment by check occurs when the check is received by the creditor.  In <u>Barnhill v. Johnson</u>, 503 U.S. 393 (1992), the Supreme Court held that the check clear date—or honor date—determines the transfer date for purposes of § 547(b).  But <u>Barnhill</u> acknowledged in dicta and left undisturbed the unanimous holdings of many courts of appeal that the check receipt date—or delivery date—determines the date of transfer for preference defenses under § 547(c).  <u>See</u> <u>Barnhill</u>, 503 U.S. at 402 n.9; <u>O'Neill v. Nestle Libbys P.R., Inc.</u>, 729 F.2d 35 (1st Cir. 1984).  The parties agree that the check receipt date controls for new values purposes.[25]

### 2.  When Goldmark gave new value

Rifken and Goldmark both agree that the crux of the new value dispute centers around <u>when</u> Goldmark gave the Debtor new value.  But that's where their agreement ends.  Rifken

---

[25] <u>See</u> Doc. No. 24, Am. Final Joint Pretrial Statement ¶ 8 n.2.

argues that Goldmark gave new value at the time it shipped the resin to the Debtor's facility on May 27, 2005. Rifken therefore believes the shipment date controls when new value was given. On the other hand, Goldmark argues that it did not give new value until a few weeks later, in late June, when it authorized the Debtor to withdraw the resin from the railcars sitting at the Debtor's facility. Goldmark therefore believes that the delivery date controls when new value was given.

Generally, to prevail on a new value defense, a creditor must show that the new value provided a material benefit to the debtor. Osborne v. Howell Elec. Motors (In re Fultonville Metal Prods. Co.), 330 B.R. 305, 311 (Bankr. M.D. Fla. 2005). The critical issue here is when Goldmark provided the material benefit to the Debtor. Rifken cites several bankruptcy court decisions[26] and a Seventh Circuit decision, Gouveia v. RDI Group (In re Globe Bldg. Materials, Inc.), 484 F.3d 946 (7th Cir. 2007), to support his argument that new value is given on the date of shipment and that the key inquiry is whether the Debtor was already contractually obligated to pay for the goods. Goldmark believes those decisions are factually distinguishable because they did not involve or discuss the terms of any contractual agreements and the courts were only restating the default rule that the date of shipment controls unless the parties agree otherwise. In support of its position, Goldmark principally relies on Silverman Consulting, Inc. v. Canfor Wood Prod. Mktg. (In re Payless Cashways, Inc.), 306 B.R. 243 (B.A.P. 10th Cir. 2004) and Meinhard-Commercial Corp. v. Hargo Woolen Mills, 112 N.H. 500 (1972), to argue that new value was not provided until the agreed-upon delivery date and that no sale was made and no

---

[26] See Rushton v. E & S Int'l Enters., Inc. (In re Eleva, Inc.), 235 B.R. 486, 489 (B.A.P. 10th Cir. 1999); Intercontinental Polymers, Inc. v. Equistar Chemicals, LP (In re Intercontinental Polymers, Inc.), 359 B.R. 868, 888 (Bankr. E.D. Tenn. 2005); Gouveia v. Seneca Petroleum Co., Inc. (In re Globe Bldg. Materials, Inc.), 334 B.R. 416 (Bankr. N.D. Ind. 2005); Begier v. Airtech Servs., Inc. (In re Am. Int'l Airways, Inc.), 56 B.R. 551 (Bankr. E.D. Pa. 1986).

title passed until that delivery date.  Goldmark contends that the parties agreed to alter the

default rule with the Consignment Agreement to change the date of delivery from the shipment

date to the date the Debtor paid and Goldmark authorized it to withdraw the resin from the

railcars.  In other words, in UCC parlance, the Consignment Agreement effectively turned a

shipment contract into a destination contract.

      The Court agrees with Goldmark.  Goldmark provided new value when it "delivered" the

resin by authorizing the Debtor to withdraw.  To begin with, the parties remarkably seem to pay

little attention to the Consignment Agreement's express language.  Specifically, it states:

> Under this Consignment Agreement (the Agreement), any and all plastic resin
> placed on leased rail track or rail siding of [the Debtor] in any location by
> Goldmark and/or its suppliers, remains the property of Goldmark until the resin is
> released to [the Debtor] by written authorization of Goldmark.  Upon authorized
> release, Goldmark will immediately invoice [the Debtor] for the released resin,
> and [the Debtor] agrees to pay for same under its normal trade terms with
> Goldmark.  Any removal of resin without prior written authorization of Goldmark
> is strictly prohibited.[27] (emphasis added).

Based on the express written terms agreed to by both parties, the resin was Goldmark's property

from shipment through transit and up until Goldmark sent written authorization, after it received

confirmation that the Debtor sent a payment.  The Court finds no ambiguity in the Consignment

Agreement's terms.  Thus, the Court disagrees with Rifken's argument that new value was

provided as soon as Goldmark put the resin on the railcars and shipped it.  The resin "remained

the property of Goldmark" until Goldmark was satisfied the Debtor had made a payment and

authorized the Debtor to withdraw.

---

[27] Def.'s Ex. 104.

The cases relied on by Rifken for the proposition that new value is given on the date of shipment did not involve agreements between the parties which altered the shipping and delivery terms of the underlying contract.  Those courts were only restating the general proposition that new value is given on the date of shipment.[28]  One of the cases Rifken relies on, In re Eleva, discusses the rationale for determining when new value is given.  The Tenth Circuit Bankruptcy Appellate Panel in Eleva recognized that § 547(c)(4) focuses on when the creditor gave new value.  The panel cited a Webster's Dictionary entry for "give," which means "to part with: relinquish."  Eleva, 235 B.R. at 489.  The panel in Eleva also distinguished its choice of using the shipment date for new value from those cases involving personal services and electricity because, when electricity (or a personal service) is relinquished by the supplier, there is no time delay in receipt.  Id.  Thus, the panel recognized that using the delivery date is more appropriate in those instances because shipment is essentially irrelevant given the lack of time delay.

Similarly, here, the delivery date is the more appropriate measure for when new value was given because the Consignment Agreement effectively made the shipping time instantaneous as the resin was Goldmark's property until it authorized the release, even if the product was sitting at the Debtor's facility.  Goldmark therefore did not deliver the resin until it gave authorization.  If the resin had been lost or destroyed in transit, or while sitting at the Debtor's facility before authorization, the risk of loss remained with Goldmark.  Cf. NH RSA 382-A:2-319(1)(b) (UCC § 2-319(1)(b)) (in a destination contract, the seller has the risk of transporting the goods).

---

[28]  Rifken's reliance on Globe Bldg. Materials is misplaced.  There, the Seventh Circuit was not concerned with when new value was given, only if new value was given.  Globe Bldg. Materials, 484 F.3d at 949.

The Court also finds the new value discussion in <u>Payless Cashways</u> relevant and applicable to this case.  <u>See</u> <u>Payless Cashways</u>, 306 B.R. at 253-56.  Although the Eighth Circuit Bankruptcy Appellate Panel was dealing with an appeal under § 547(c)(1), the key question concerned "when new value was given."  <u>Id.</u> at 253.  The dispute also turned on the same arguments made here: whether new value was given when the goods were shipped or when they were delivered.  <u>Id.</u>  To summarize, the court held that new value was provided on the delivery date, not the shipment date, because the parties' invoices created a destination contract, rather than the more normal shipment contract.  <u>Id.</u> at 255.

Likewise here, the Consignment Agreement changed the Requirements Contract by changing what was a shipment contract[29] into a destination contract because the Consignment Agreement expressly states that the goods remained Goldmark's property until they were released.  The trial testimony and evidence also supports this interpretation.  Therefore, Goldmark did not accomplish delivery until it told the Debtor it could release the resin and placed the goods at the Debtor's disposal, and new value was not given until that point.[30]  <u>See</u> NH RSA 382-A:2-401(1) (title to goods passes from the seller to the buyer on any conditions explicitly agreed on by the parties); RSA 382-A:2-401(2)(b) (if the contract requires delivery at the destination, then title passes on tender there); <u>see also</u> <u>Meinhard-Commercial Corp.</u>, 112

---

[29]  <u>See</u> Pl.'s Ex. 1 (indicating under the "Terms" section that all goods sold under the Requirements Contact "shall be sold F.O.B. Pinnacle Polymers Plant freight prepaid and delivered to customer shipping point").  As stated earlier, Goldmark bought its resin from Pinnacle and had Pinnacle ship it to the Debtor.

[30]  Rifken also makes much of the "underlying economic reality" and the "economic substance" of the parties' business relationship in contending that the real purpose of the Consignment Agreement was to stretch the period between invoices to allow the Debtor to stay under its credit limit.  That may be so, but that issue is entirely separate from the legal question of when new value was given for § 547(c)(4) purposes.

N.H. at 505 (finding no sale of unused goods where parties agreed that the buyer could store goods on its premises and not pay until it sent notice to the seller of its intent to use the goods). Accordingly, new value was given on the delivery date after the payments in question had been received.[31]

### 3.  How to apply new value

The majority position allows creditors to carry forward preferences until they are exhausted by subsequent advances of new value.  DeGiacomo v. Draper Knitting Co., Inc. (In re Jannel Indus., Inc.), 245 B.R. 757, 761 (Bankr. D. Mass. 2000) (citing Mosier v. Ever-Fresh Food Co. (In re IRFM, Inc.), 52 F.3d 228, 232 (9th Cir. 1995)).  Thus, creditors may apply the giving of new value against the immediately preceding preference and against all prior preferences.  Crichton v. Wheeling Nat'l Bank (In re Meredith Manor, Inc.)), 902 F.2d 257, 259 (4th Cir. 1990).  Using this approach, Goldmark provided $391,128.00 in new value to the Debtor based on its four deliveries of resin that offset the disputed transfers.  Thus, Rifken may only recover $165,827.30 of the preferential transfers based on Goldmark's successful new value defense and the $234,353.90 in stipulated new value.

### C.  Prejudgment interest

Rifken requests an award of prejudgment interest because trustees who successfully sue to recover preferential payments can receive prejudgment interest from the date the complaint was filed.  Bankruptcy courts have discretion to award prejudgment interest.  Bergquist v.

---

[31]  Even though the Debtor's payment and Goldmark's new value were provided on the same day, the record establishes that the new value was provided after the payment transfers.  See Henderson v. Allred (In re Western World Funding, Inc.), 54 B.R. 470, 479 n.5 (Bankr. D. Nev. 1985) (even if both transactions occur on the same day, new value must still be advanced after the transfer at issue).

Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.), 850 F.2d 1275, 1281 (8th Cir. 1988); In re Roco Corp., 37 B.R. 770, 774 (Bankr. D.R.I. 1984).  Exercising this discretion, bankruptcy courts have denied awards of prejudgment interest where preference defendants raise credible or respectable defenses.  See, e.g., Harrah's Tunica Corp. v. Meeks (In re Armstrong), 291 F.3d 517, 528 (8th Cir. 2002); Sacred Heart Hosp. of Norristown v. E.B. O'Reilly Servicing Corp. (In re Sacred Heart Hosp. of Norristown), 200 B.R. 114, 119 (Bankr. E.D. Pa. 1996).  The Court declines to award Riken prejudgment interest in this action because Goldmark raised credible defenses under § 547(c)(2) and (c)(4).

## IV.  CONCLUSION

To summarize, although Goldmark did not establish its ordinary course defense, it prevailed in full on the disputed portions of its new value defense.  Therefore, Rifken is only entitled to recover $165,827.30 as preferential transfers.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate judgment consistent with this opinion.

ENTERED at Manchester, New Hampshire.

Date:  October 16, 2009          /s/ J. Michael Deasy
                                 J. Michael Deasy
                                 Bankruptcy Judge